**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ESSROC CEMENT CORP., |
|    Plaintiff, |
|     v. |
| CTI/D.C., INC., |
|    Defendant. |

Civil Action No. 08-2196 (CKK)

**MEMORANDUM OPINION**
(September 27, 2010)

Plaintiff Essroc Cement Corp. ("Plaintiff") brings the present action against Defendant

CTI/D.C., Inc. ("Defendant") (together, the "Parties"), asserting causes of action for breach of

contract, unjust enrichment, and fraud in connection with Plaintiff's extension of credit and

provision of goods, materials, and services to Defendant in the spring and fall of 2008. Presently

before the Court is Plaintiff's [26] Motion for Summary Judgment, which Defendant has failed to

oppose or respond to in any fashion. After reviewing Plaintiff's submissions, including the

attachments thereto, the relevant authorities, and the record as a whole, the Court shall GRANT-

IN-PART and DENY-IN-PART Plaintiff's Motion for Summary Judgment, for the reasons set

forth below.

## I. BACKGROUND

*A.*    *Factual Background*

     1.    <u>The Parties and their Contractual Relationship</u>

Plaintiff, a Pennsylvania corporation with its principal place of business within that state,

is engaged in the business of producing and providing cement to clients throughout the United

States, Canada, and Puerto Rico.[1]  Pl.'s Stmt., Docket No. [26], ¶¶ 1, 3.  Defendant, incorporated

and operating at least in part in the District of Columbia, is in the business of providing ready-

mix concrete to commercial and residential developers.  Pl.'s Stmt. ¶¶ 2, 4; V. Answer, Docket

No. [10-2], ¶¶ 2, 5.

On or about January 23, 2008, the Parties entered into an agreement, the primary purpose

of which was to enable Defendant to purchase goods, materials, and services – most notably,

cement – on credit from Plaintiff (the "Credit Agreement").  Pl.'s Stmt. ¶¶ 5-6 and Ex. A (Credit

Agreement).[2]  The terms of the Credit Agreement itself are relatively sparse, contemplating that

individual sales of concrete would be governed by more specific terms and conditions to

accompany such sales.  Specifically, the Credit Agreement provides, in relevant part:

> All sales will be subject to further Terms and Conditions as provided, as revised from
> time to time without notice to [Defendant], and such revised Terms and Conditions
> shall prevail on all shipments after the date of revision regardless of when the related
> orders were received.

---

[1]  As set forth in greater detail below, *see infra.* Part II.B, this Court strictly adheres to the
text of Local Civil Rule 7(h) (formerly Local Civil Rule 56.1).  In this case, as Defendant has
failed to discharge its burden to submit a statement of material facts at issue and therefore
requiring litigation, the Court shall treat as admitted the facts identified in Plaintiff's Statement
of Material Facts ("Pl.'s Stmt.").  *See* LCvR 7(h).  Nevertheless, in an exercise of its discretion,
the Court has independently reviewed the entire record to confirm that there is adequate support
for Plaintiff's submissions.

[2]  The Credit Agreement was signed by Patrick Bell, a duly authorized representative of
Defendant.  Pl.'s Stmt. ¶¶ 7-8 and Ex. A (Pl.'s Req. for Admis.) ¶¶ 3-6.  At the time, Mr. Bell
served as Defendant's Chief Financial Officer, and, in the course of the Parties' dealings, held
himself out to be (and in fact was) authorized to execute the agreement on Defendant's behalf.
*Id.*  Although Defendant has previously taken the position in this litigation that Mr. Bell was a
mere "consultant" to Defendant, *see* Def.'s Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a),
Docket No. [25], at ¶ 2, Plaintiff's characterization of Mr. Bell's position and his authority to
bind Defendant is, for reasons set forth elsewhere, deemed admitted by operation of Local Civil
Rule 7(h) and Fed. R. Civ. P. 36(b).

Pl.'s Stmt. Ex. A (Credit Agreement) at 1.

Subsequently, as contemplated by the Credit Agreement, each individual delivery of cement products from Plaintiff to Defendant was followed by an invoice covering one or more deliveries, which set forth the terms and conditions of the sale (the "Terms and Conditions").[3] Pl.'s Stmt. ¶ 10 and Ex. C (Pl.'s Req. for Admis.) Sub-Exs. A-AA (Invoices and Bills of Lading). The Terms and Conditions accompanying each sale supplemented the Credit Agreement, and fleshed out the contours of the Parties' contractual relationship. Specifically, with respect to payment, the Terms and Conditions provided that invoices were "payable in full not later than the last day of the month following the month in which shipments were made."[4] Pl.'s Stmt. Ex. B

---

[3] From Plaintiff's various submissions to the Court, it is not entirely clear whether the Terms and Conditions appeared on the back of the Credit Agreement, the bills of lading, the invoices, or some combination of the three. For instance, whereas Plaintiff alleges in the Complaint that "[t]he Terms and Condition[s] appeared on the back side of the Credit Agreement *and* on each invoice sent to Defendant," Compl., Docket No. [1], ¶ 9 (emphasis added), Plaintiff's Statement of Material Facts somewhat vaguely provides that "[t]he Terms and Condition[s] of the Credit Agreement appear on each invoice sent to Defendant," Pl.'s Stmt. ¶ 10. Meanwhile, the bills of lading submitted by Plaintiff in support of its motion suggest that the Terms and Conditions may have appeared on the backside of those documents as well. Pl.'s Stmt. Ex. C (Pl.'s Req. for Admis.) Sub-Exs. A-AA. Unfortunately, the Court's determination of the issue was not aided by Plaintiff's decision to submit the Terms and Conditions as a single, separate exhibit rather than including it as part of the relevant document(s). *See* Pl.'s Stmt. Ex. B (Terms and Conditions). Judging from the choice-of-law clause that appears therein, it appears that at least that iteration accompanied an invoice. *See id.* at 1 ("The laws of the Commonwealth of Pennsylvania . . . shall govern any dispute between Essroc and the Customer arising from or in connection with *this invoice*") (emphasis added). The confusion, however, is ultimately immaterial, as it is undisputed that the identical Terms and Conditions were set forth on each invoice sent to Defendant, Pl.'s Stmt. ¶ 10, and that Defendant "never disputed or questioned the validity or substance of any of the Invoices," *id.* ¶ 42. More to the point, for purposes of this motion, it is undisputed that Plaintiff provided Defendant cement products "[p]ursuant to the Credit Agreement and the Terms and Conditions." *Id.* ¶ 12.

[4] However, for cash-on-delivery invoices, payment was considered past due if not paid in full upon delivery.

(Terms and Conditions) at 1. Balances past due would be "subject to a service charge of one and one half percent (1-1/2%) per month or the highest rate permissible by law." *Id.* And, in the event Defendant failed to comply with the terms of payment, the Terms and Conditions reserved to Plaintiff the right to terminate deliveries and to exercise its right to recover for all unpaid accounts. *Id.*

### 2. The Deterioration of the Parties' Commercial Relationship

Beginning in April 2008, Plaintiff periodically supplied to Defendant various cement products pursuant to the Credit Agreement and the Terms and Conditions. *Id.* ¶¶ 12-28. From the outset, the relationship was a troubled one, as Defendant never paid any of the invoices issued by Plaintiff. *Id.* ¶ 43. On or about September 8, 2008, prompted by the ballooning number of invoices that remained unpaid by Defendant (at least sixteen invoices had been issued, with a total amount outstanding approaching $500,000), Plaintiff advised Defendant that, going forward, Plaintiff would be required to purchase cement on a cash-on-delivery basis.[5] *Id.* ¶¶ 13-28, 44-45.

Thus, beginning on September 8, 2008 and continuing at least through September 17, 2008, Plaintiff supplied Defendant with cement exclusively on a cash-on-delivery basis. *Id.* ¶¶ 29-34. Despite this arrangement, between September 11, 2008 and September 18, 2008, Defendant proceeded to issue to Plaintiff a series of bad checks.[6] All in all, Defendant issued a

---

[5] Plaintiff's decision to impose this requirement fell within the boundaries of the Terms and Conditions. *See* Pl.'s Stmt. Ex. B (Terms and Conditions) at 1 ("If at any time the financial responsibility of Customer becomes impaired or unsatisfactory to Essroc, Essroc reserves the right to require payments in advance or such other security or guarantee as Essroc deems appropriate.").

[6] Defendant issued these checks via the "CHAX" check software system.

total of four checks to Plaintiff in the aggregate amount of $27,224.01, purportedly in payment of six separate invoices issued by Plaintiff. *Id.* ¶¶ 47, 49, 52. All four checks were returned for insufficient funds. *Id.* And, in all four instances, it is undisputed that Defendant knew that it held insufficient funds in its bank account to cover the amounts designated at the time the checks were issued. *Id.* ¶¶ 48, 50-51, 53.

3.     The Defendant's Assurances and Plaintiff's Demand

On or about September 29, 2008, "[f]or purposes of inducing [Plaintiff] to supply it with additional cement," Defendant told Plaintiff that it would convert a certificate of deposit ("CD") to pay Plaintiff $240,000 towards its past-due balance. *Id.* ¶ 56. However, Defendant actually had no intention of converting the CD at the time these representations were made to Plaintiff. *Id.* ¶ 57. Plaintiff nevertheless supplied to Defendant approximately $33,153.96 worth of cement between September 30, 2008 and October 9, 2008.[7] *Id.* ¶¶ 38-39. It is undisputed that Plaintiff never received payment for these goods. *Id.* ¶¶ 42-43, 59; V. Answer ¶ 21.

On November 11, 2008, apparently having had its fill, Plaintiff sent to Defendant a certified letter demanding full payment of the unpaid invoices, as well as accrued service charges on past-due invoices. Pl.'s Stmt. ¶ 58. As of that date, Defendant was delinquent in its payments in the principal amount of $552,577.77 and had incurred service charges in the amount of $33,925.72, for a total of $586,503.49. Pl's Stmt. Ex. C (Pl.'s Req. for Admis.) Sub-Ex. EE (Certified Letter) at 1-2. Defendant received the letter, but failed to respond or remit payment in

---

[7] Although not directly addressed in Plaintiff's submissions, it appears that Plaintiff continued to supply Defendant with cement products between September 19, 2008 and September 22, 2008, the time intervening between Defendant's issuance of bad checks and the time of Defendant's alleged representations regarding the conversion of the CD. Pl.'s Stmt. ¶¶ 35-37.

any amount.  Pl.'s Stmt. ¶¶ 58-59.  It is undisputed that Defendant has received a copy of each of the invoices underlying these figures and, prior to Plaintiff's filing of the Complaint in this action, has never disputed or questioned their validity.  *Id.* ¶¶ 41-42.  To date, Defendant has never paid any of the invoices.  *Id.* ¶¶ 43-44, 59.

B.     *Procedural History*

Plaintiff filed this action against Defendant on December 17, 2008, asserting three causes of action based upon Defendant's alleged failure to pay for the cement supplied by Plaintiff.  *See* Compl., Docket No. [1].  A copy of the Summons and Complaint was served on Defendant, via its registered agent, on December 19, 2008.  *See* Return of Serv./Aff., Docket No. [4].  Having received no response in the time allotted by the Federal Rules of Civil Procedure, Plaintiff requested an entry of default, *see* Pl.'s Req. for Entry of Default, Docket No. [5], which the Clerk of the Court subsequently entered on or about February 3, 2009, *see* Clerk's Entry of Default, Docket No. [6].  Thereafter, Plaintiff  moved this Court for entry of judgment by default.  *See* Pl.'s Mot. for Default J., Docket No. [7].  Before the Court had an opportunity to consider and rule upon Plaintiff's motion, Defendant filed a Motion to Set Aside Entry of Default and Opposition to Motion for Entry by Default, asserting that it did not have actual notice of the lawsuit prior to learning of Plaintiff's motion.  *See* Def.'s Mot. to Set Aside Default, Docket No. [10].[8]  On  November 9, 2009, finding, *inter alia*, that Defendant had sufficiently demonstrated a lack of willfulness on its part, the Court granted Defendant's Motion to Set Aside Entry of Default and denied Plaintiff's Motion for Entry of Judgment by Default.  *See* Nov. 9, 2009 Mem.

---

[8]  Defendant's submissions included a purported Verified Answer to Plaintiff's Complaint.  *See* Def.'s V. Answer, Docket No. [10-2].

6

Op., Docket No. [14].

Unfortunately, Defendant's active participation in this action was short lived. Prior to making any meaningful inroads into discovery, the Court referred this case to the Court's Mediation Program pursuant to the Parties' request. *See* Dec. 14, 2009 Order, Docket No. [17]. When Defendant's counsel failed to participate in the Court's Mediation Program, and also failed to appear at a Court-ordered Initial Scheduling Conference, Defendant was ordered to file written notice explaining why Defendant's counsel should not be held in contempt.[9] *See* Mar. 5, 2010 Order, Docket No. [19]. In so doing, the Court noted that the aforementioned conduct "continue[d] a pattern of indifference towards the defense of this lawsuit that began with Defendant's failure to timely file an answer and a subsequent entry of default against Defendant (which was later set aside by the Court)." *Id.* at 1. That pattern has continued unabated.

The Parties proceeded to the initial stages of discovery in this action, undertaking to serve any written discovery upon each other on or before April 12, 2010, with responses to be provided in accordance with the Federal Rules of Civil Procedure and the Court's Local Rules. *See* Joint Report as to Disc. Plan, Docket No. [23], at 1; *see also* Joint Local Civ. Rule 16.3(c) Stmt., Docket No. [16], at ¶ 8(b). On April 12, 2010, consistent with these strictures, Plaintiff properly and timely served upon Defendant 132 Requests for Admission. *See* Pl.'s Stmt. Ex. C (Reqs. for Admis.) at 18. Plaintiff failed to respond or object to Plaintiff's Requests for Admission within the allotted thirty-day period, *see* Fed. R. Civ. P. 36(a)(3), or at any time thereafter. Nor does it

---

[9] Defendant's counsel subsequently filed a notice with the Court claiming to have mis-calendared the date of the Initial Scheduling Conference, but providing no explanation for Defendant's failure to participate in the Court's Mediation Program as ordered. *See* Def.'s Not. to Court, Docket No. [21].

appear that Defendant has ever sought any discovery from Plaintiff.

On June 11, 2010, Plaintiff proceeded to file the present Motion for Summary Judgment. *See* Not. of Pl.'s Mot. for Summ. J., Docket No. [26]. Defendant once again failed to respond, prompting Plaintiff to file a notice with the Court indicating that Defendant's time to file opposition papers had expired, thus rendering the motion ripe for adjudication. *See* Praecipe regarding Pl.'s Mot. for Summ. J., Docket No. [27], at 1. While a copy of the notice was served upon Defendant's counsel via the Court's ECF system, *id.* at 2, Defendant has nevertheless failed to provide a response of any kind to the present motion. Defendant's failure cannot be for want of time, as well over three months have elapsed since Plaintiff's motion was first filed with the Court.

## II. LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery [if any] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). All underlying facts and inferences

are analyzed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

A.     *Defendant's Failure to File an Opposition to Plaintiff's Motion*

At the outset, the Court observes that, as of the date of this opinion, Defendant has failed to file a Memorandum of Points and Authorities in opposition to Plaintiff's Motion for Summary Judgment. As a result, the Court may elect to treat the present motion as conceded. *See* LCvR 7(b) ("If [a memorandum of points and authorities in opposition to the motion] is not filed within the prescribed time, the Court may treat the motion as conceded.").[10] The D.C. Circuit Court of Appeals has explained that this rule "is a docket-management tool that facilitates efficient and effective resolution of motions by requiring the prompt joining of issues." *Fox v. Am. Airlines*, 389 F.3d 1291, 1294 (D.C. Cir. 2004). Ultimately, however, the determination of whether to enforce the rule is "highly discretionary," *Yelder v. Gates*, Civ. A. No. 09-1301 (RJL), 2010 WL 2521718, at *2 (D.D.C. June 22, 2010), and the decision "lies wholly with the district court," *Fed. Deposit Ins. Co. v. Bender*, 127 F.3d 58, 68 (D.C. Cir. 1997) (reviewing a predecessor to Local Civil Rule 7(b)). Here, although it would much prefer the benefit of the refinement of issues that accompanies a contested motion, the Court declines to invoke the rule, and will instead engage in an independent review of the record and authorities relied upon by the Plaintiff to satisfy itself as to the merits of the present motion.

---

[10] Similarly, when a party files an opposition to a dispositive motion, yet fails to address certain arguments raised by the moving party, the Court may treat those specific arguments as conceded. *Yelder v. Gates*, Civ. A. No. 09-1301 (RJL), 2010 WL 2521718, at *2 (D.D.C. June 22, 2010).

B.      *Defendant's Failure to File a Statement of Material Facts at Issue*

While the Court has elected not to exercise its discretion to treat Plaintiff's motion as conceded as a result of Defendant's failure to submit a Memorandum of Points and Authorities, this is hardly Defendant's only failing.  Here, the Court notes that the District Court for the District of Columbia has supplemented Federal Rule of Civil Procedure 56 with Local Civil Rule 7(h), which requires that each party submitting a motion for summary judgment attach a statement of material facts to which that party contends there is no genuine issue, with specific citations to those portions of the record upon which the party relies in fashioning the statement. The party opposing such a motion must, in turn, submit a statement enumerating all material facts which the party contends are at issue and thus require litigation.  *See* LCvR 7(h)(1).  Where the opposing party fails to discharge this obligation, a court may take all facts alleged by the movant as admitted.  *Id.*; *see also Arrington v. U.S.*, 473 F.3d 329, 335 (D.C. Cir. 2006) (holding that non-compliance with Local Civil Rule 7(h) permits the district court to assume the facts identified by the moving party as admitted, though the court retains the discretion to review the entire record).

This well-reasoned rule "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record."  *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (citing *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir.), *cert. denied*, 490 U.S. 1066 (1988); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 406 (6th Cir. 1992)).  Because of the significance of this task and the potential hardship placed on the courts if parties are derelict in their duty, courts require strict compliance with the Rule.  Indeed,

this Court strictly adheres to the text of Local Civil Rule 7(h) when resolving motions for summary judgment, a matter previously brought to the Parties' attention. *See* Scheduling and Procedures Order, Docket No. [20], at ¶ 6.

In this case, whereas Plaintiff filed a statement in conformance with Local Civil Rule 7(h)(1), Defendant has failed to discharge its corresponding burden to come forward and submit a statement enumerating all material facts allegedly at issue and thus requiring litigation. As such, although discretionary in the text of Local Civil Rule 7(h), this Court shall "assume[] that facts identified by [Plaintiff] in its statement of material facts are admitted" in resolving the present summary judgment motion. LCvR 7(h). The Court concludes that Defendant has been given more than adequate opportunity to be heard, but has repeatedly failed to take advantage of its opportunities to defend itself in this action. *See also supra.* Part I.B. The Court has reviewed the record citations to ensure that the representations made in Plaintiff's statement are accurate, and, where possible, the Court cites to Plaintiff's Statement of Material Facts filed in accordance with Local Civil Rule 7(h)(1).

## C. *Defendant's Failure to Respond to Plaintiff's Requests for Admission*

In any event, even if Defendant had hypothetically submitted a statement in compliance with Local Rule 7(h), it would be of little avail in light of its separate and independent failure to respond to Plaintiff's properly served Requests for Admission within the time allotted by the Federal Rules of Civil Procedure. Pursuant to Fed. R. Civ. P. 36(a)(1), a party may serve on any other party written requests to admit the truth of any matters relating to facts, the application of law to fact, or opinions about either, and the genuineness of any described documents. If the party served fails to respond within thirty days of service, either by written answer or objection,

the matters described are deemed admitted. Fed. R. Civ. P. 36(a)(3). Moreover, once a matter is deemed admitted under the Rule, it is to be considered "conclusively established" unless the party moves to amend or withdraw. Fed. R. Civ. P. 36(b); *see also Anchorage-Hynning & Co. v. Moringiello*, 697 F.2d 356, 363 (D.C. Cir. 1983) ("By force of Rule 36, matter subjected to [a request for admission] is admitted for purposes of the litigation pending unless answered or objected to"); *Rainbolt v. Johnson*, 669 F.2d 767, 768 (D.C. Cir. 1981) (district court "erred in failing to give binding and conclusive effect to . . . unanswered requests for admissions."); *Baker v. Potter*, 212 F.R.D. 8, 11 (D.D.C. 2002) (absent a timely response or objection, "matters contained in the requested admissions are automatically admitted"). This well-reasoned rule is designed to serve the purpose of reducing trial time by defining and narrowing the matters in controversy between the parties. *Baker*, 212 F.R.D. at 11 (citing *Foretich v. Chung*, 151 F.R.D. 3, 4 (D.D.C. 1993)).

As set forth above, Plaintiff properly and timely served upon Defendant 132 Requests for Admission, and Defendant failed to respond within the allotted thirty-day period or at any time thereafter. By automatic operation of Rule 36, each of the matters set forth therein are "conclusively established" for purposes of the present litigation. Fed. R. Civ. P. 36(b). Such deemed admissions may properly support a motion for summary judgment. *See, e.g.*, *Unitronics (1989) (R"G) Ltd. v. Gharb*, 511 F. Supp. 2d 123, 135 (D.D.C. 2007); *Russell v. Comm'r of Patents and Trademarks*, 695 F. Supp. 572, 573 (D.D.C. 1988). Indeed, where the "facts that are admitted under Rule 36 are 'dispositive' of the case, then it is proper for the district court to grant summary judgment." *Quasius v. Schwan Food Co.*, 596 F.3d 947, 950-51 (8th Cir. 2010); *see also Praetorian Ins. Co. v. Site Inspection LLC*, 604 F.3d 509, 514 (8th Cir. 2010) (providing

that affidavits and depositions entered in opposition to summary judgment cannot refute deemed admissions). Thus, because nearly all of the material facts enumerated in Plaintiff's Statement of Material Facts rest upon such "deemed" or "default" admissions, Defendant's separate and independent failing in this regard would nevertheless have led to the same result even if Defendant had hypothetically fulfilled its obligation to submit a statement of material facts at issue in conformance with Local Civil Rule 7(h).

### III. DISCUSSION

Plaintiff seeks judgment as a matter of law on each of its causes of action for breach of contract, unjust enrichment, and fraud – the only claims Plaintiff has asserted in this action. Plaintiff contends that the undisputed facts demonstrate that Defendant (1) breached the terms of the Credit Agreement and Terms and Conditions or, in the alternative, has been unjustly enriched due to its failure to pay for the cement supplied to it by Plaintiff,[11] and (2) has committed fraud against Plaintiff based upon Defendant's allegedly false representations that it would convert a CD to pay amounts owed to Plaintiff by a certain date. The Court shall consider each of these contentions in turn below.

*A.    Plaintiff's Claim for Breach of Contract*

1.    <u>Choice-of-Law</u>

Because this is a diversity case, the Court must first determine which state law to apply to Plaintiff's cause of action for breach of contract. In resolving this question, the Court applies the District of Columbia's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487,

---

[11] Plaintiff's claim for unjust enrichment is asserted in the alternative to its claim for breach of the Parties' express agreements. *See* Compl. ¶ 36; Pl.'s Mem. P.&A., Docket No. [26], at 8.

496 (1941).  The District of Columbia courts have "adopted the general rule 'that parties to a contract may specify the law they wish to govern, as part of their freedom to contract, as long as there is some reasonable relationship with the state specified.'" *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1394 (D.C. Cir. 1995) (quoting *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980)); *accord America's Choice, Inc. v. Bienvenu*, 700 F. Supp. 2d 1, 5 (D.D.C. 2010); *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 144, 155 n.3 (D.D.C. 2008).

Here, the Terms and Conditions governing all of the sales at issue includes the following choice-of-law provision:

> The laws of the Commonwealth of Pennsylvania, including the UCC, shall govern any dispute between Essroc and [Defendant] arising from or in connection with this invoice or its terms and conditions, and payment [t]hereof.

Pl.'s Stmt. Ex. B (Terms and Conditions) at 1.  Plaintiff's status as a Pennsylvania corporation with its principal place of business within that state, *see* Pl.'s Stmt. ¶ 1, more than suffices to meet the "reasonable relationship" threshold required to support the express choice-of-law provision set forth in the Parties' agreement.  *See, e.g.*, *Ekstrom*, 68 F.3d at 1394 ("undisputed connection" to chosen jurisdiction where one party operated principally within that jurisdiction).  This conclusion is bolstered by the fact that the Parties' contractual relationship, including the disputes at issue in this case, was overseen at least in part by Plaintiff's personnel in Pennsylvania.  *See* Pl.'s Stmt. ¶¶ 54, 56.[12]  The Court shall therefore honor the Parties' agreement

---

[12]  Nor can Defendant be heard to complain of the application of Pennsylvania law here, having failed to offer any rebuttal to Plaintiff's contention that the choice-of-law provision in the Terms and Conditions should be applied in this case.  *See Davis v. Grant Park Nursing Home LP*, 639 F. Supp. 2d 60, 64-65 (D.D.C. 2009) (noting that courts need not address choice-of-law questions *sua sponte*, and are free to accept parties' assumptions on that point).  In any event, because the laws of the District of Columbia and Pennsylvania are substantially the same in all respects germane to the present motion, the application of District of Columbia law would yield

and proceed to apply Pennsylvania law to Plaintiff's claim for breach of contract.

2.     Merits of Plaintiff's Breach of Contract Claim

Under Pennsylvania law, in order to successfully maintain a cause of action for breach of

contract, the plaintiff must establish: (1) the existence of a contract, including its essential terms;

(2) the defendant's breach of a duty imposed by the contract; and (3) resultant damages. *Gorski*

*v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002), *appeal denied*, 856 A.2d 834 (Pa. 2004); *see*

*also McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010) ("The necessary material

facts that must be alleged . . . are simple: there was a contract, the defendant breached it, and

plaintiff[] suffered damages from the breach.").  Plaintiff has met its burden in all respects.

First, it is undisputed that Plaintiff and Defendant entered into the Credit Agreement,

whereby Plaintiff agreed to supply to Defendant cement products on credit.  Pl.'s Stmt. ¶¶ 5-6

and Ex. A (Credit Agreement).  The Credit Agreement, in turn, expressly contemplated that all

future sales by Plaintiff to Defendant would be subject to the additional Terms and Conditions.

*Id.* at 1.  During the course of the Parties' relationship, each sale was accompanied by an invoice,

which set forth the identical Terms and Conditions, and it is undisputed that Plaintiff provided

Defendant cement products "[p]ursuant to the Credit Agreement and the Terms and Conditions."

*Id.* ¶¶ 10, 12, 42.

Second, pursuant to the terms of the Credit Agreement and the Terms and Conditions,

---

the same result.  *Compare Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)
(enumerating the elements required to establish a claim of breach of contract under District of
Columbia law), *and Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250, 254 (D.D.C.) (same), *aff'd*,
No. 10-7023, 2010 WL 3068952 (D.C. Cir. Aug. 4, 2010), *with McShea v. City of Philadelphia*,
995 A.2d 334, 340 (Pa. 2010) (enumerating the elements required to establish a claim for breach
of contract under Pennsylvania law).

Defendant was obligated to render payment on each invoice "not later than the last day of the month following the month in which shipments were made." Pl.'s Stmt. Ex. B (Terms and Conditions) at 1. Where Defendant failed to meet that obligation, overdue balances would be "subject to a service charge of one and one half percent (1-1/2%) per month or the highest rate permissible by law." *Id.* Despite these unambiguous terms, Defendant repeatedly breached the Credit Agreement and Terms and Conditions over the course of the Parties' relatively short commercial relationship. Indeed, Defendant has never paid any of the invoices issued by Plaintiff, all while never disputing or questioning their validity. *Id.* ¶¶ 41-44. The Court finds it difficult to conjure a more obvious breach.

Finally, Plaintiff has also carried its burden of establishing an entitlement to damages, though its submissions have hardly eased the Court's task of calculating those damages. Specifically, in connection with its claim for breach of contract, Plaintiff seeks damages in the amount of $552,577.77 in past due balances for cement invoiced and $185,816.01 in service charges accruing at 1.5% per month through the week prior to Plaintiff's motion. Pl.'s Mem. P.&.A. at 7-8. Although there is ample support in the record for Plaintiff's contention that the principal amount due totals $552,577.77, *see* Pl.'s Stmt. ¶¶ 44, Ex. C (Pl.'s Req. for Admis.) ¶ 7 and Sub-Exs. A-AA, EE, the same is not true for the latter figure.

In support of the claimed service charges figure, Plaintiff cites to two paragraphs from its Statement of Material Facts; those paragraphs unhelpfully set forth broad sections of the Parties' agreements and provide that Defendant has failed to render payment on any invoices. Pl.'s Stmt. ¶¶ 11, 43. Indeed, the Court can find no support in the record submitted by Plaintiff pointing to the proper measure of service charges as of June 4, 2010 (or at the time of the filing of Plaintiff's

motion). Instead, the only concrete figure supported by the record appears in a Service Charge Invoice sent by Plaintiff to Defendant on or about November 11, 2008. *See* Pl.'s Stmt. Ex. C (Pl.'s Req. for Admis.) Sub-Ex. EE. That document identifies the service charges outstanding as of that date as $33,925.72. *Id.* at 2. Although the Court does not doubt that the figure has grown in the intervening months, Plaintiff has failed to bring to this Court's attention sufficient documentation demonstrating the proper calculation of service fees as of today, and it is not this Court's burden to hunt down the pertinent materials and attempt a calculation of Plaintiff's damages.[13] Accordingly, the Court finds that Plaintiff has only established its entitlement to damages in the amount of $586,503.49, representing the principal amount and service charges outstanding as of November 2008.

### 3. Attorney's Fees and Costs

In addition to compensatory damages, Plaintiff seeks to recover attorney's fees and costs in connection with its breach of contract claim. Under Pennsylvania law, which applies to Plaintiff's breach of contract claim, "a litigant cannot recover counsel fees . . . unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 482-83 (Pa. 2009) (citing *Mosaica Acad. Charter Sch. v. Commonwealth Dep't of Educ.*, 813 A.2d 813, 822 (Pa. 2002)); *see also*

---

[13] Indeed, the Court could not discharge such a burden even if it were so inclined. Because the record is not entirely clear as to which of the invoices in the period extending from September 19, 2008 through October 9, 2008 were extended to Defendant on credit and which were provided on a cash-on-delivery basis, *see* Pl.'s Stmt. ¶¶ 35-39, the Court is unable to determine the date on which service charges for those transactions should begin to accrue. *See* Pl.'s Stmt. Ex. B (Terms and Conditions) at 1 ("All *past due* balances will be subject to a service charge of one and one half percent (1-1/2%) per month or the highest rate permissible by law.") (emphasis added).

*Precision Door Co., Inc. v. Meridian Mut. Ins. Co.*, 353 F. Supp. 2d 543, 558 (E.D. Pa. 2005)

("courts [may] award attorney's fees when there is a clear agreement between the parties that

[such] fees will be awarded").

Here, there is no ambiguity in the Parties' agreements. The Credit Agreement provides:

"Customer agrees to pay any collection costs incurred by Essroc whether by suit or otherwise,

including any attorney's fees." Pl.'s Stmt. Ex. A (Credit Agreement) at 1. Indeed, even if this

language had not expressly contemplated Plaintiff's recovery of attorney's fees in the course of

prosecuting a lawsuit against Defendant, at least one Pennsylvania court has concluded that the

term "collection costs" is sufficiently broad to encompass both attorney's fees and costs. *See*

*Wrenfield Homeowners Ass'n, Inc. v. DeYoung*, 600 A.2d 960, 963 (Pa. Super. Ct. 1991) (trial

court properly imposed attorney's fees when it found that such fees were included in the phrase

"costs of collection" in relevant agreement). Based upon the Parties' clear agreement, the Court

therefore concludes that Plaintiff is entitled to reasonable attorney's fees and costs.[14]

B.      *Plaintiff's Claim for Unjust Enrichment*

Plaintiff further contends that, "were the Court to somehow determine that the Credit

Agreement is invalid," it would nevertheless be entitled to recover the value of the goods and

---

[14] Although contracting parties may generally structure their agreement as they choose, *Waynesborough Country Club of Chester Cnty. v. Diedrich Niles Bolton Architects, Inc.*, Civ. A. No. 07-155, 2008 WL 4916029, at *3 (E.D. Pa. Nov. 12, 2008), even where an agreement does not explicitly provide that the fees incurred must be reasonable, "the trial court may consider whether the fees claimed to have been incurred are reasonable, and reduce the fees claimed if appropriate," *McMullen v. Kutz*, 985 A.2d 769, 777 (Pa. 2009); *see also Wrenfield*, 600 A.2d at 964 (trial court properly exercised discretion in assessing reasonableness of attorney's fees claimed pursuant to contract). As such, although the attorney's fees clause in the Credit Agreement contains no express reasonableness limitation, the Court shall evaluate Plaintiff's claimed fees for reasonableness.

services it provided to Defendant under the theory of unjust enrichment. Pl.'s Mem. P.&A. at 8.

As Plaintiff has prevailed on its cause of action for breach of contract, the Court need not address

its alternative argument that recovery should be had under the theory of unjust enrichment. *See*

*Reiman & Co. v. Eromanga Investments, N.V.*, 622 F. Supp. 13, 21 (D.D.C. 1985) (finding it

unnecessary to address plaintiff's alternative argument under the theory of *quantum meruit* where

plaintiff had already prevailed on parallel breach of contract claim).

   C.  *Plaintiff's Claim for Fraud*

     1.  <u>Choice-of-Law</u>

Because the choice-of-law provision in the Parties' agreements does not extend to

Plaintiff's cause of action for fraud, the Court must separately determine the applicable law

pursuant to the District of Columbia's choice-of-law rules. *Klaxon*, 313 U.S. at 496; *see also*

*Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1228 (D.C. Cir. 2004) ("[d]ifferent law may apply

to different issues in a lawsuit" depending upon the facts and legal claims at issue in a particular

case) (internal quotation marks omitted). Under those rules, a court first determines whether a

"true conflict" exists between the laws of competing jurisdictions. *GEICO v. Fetisoff*, 958 F.2d

1137, 1141 (D.C. Cir. 1992). Where no true conflict exists, a court applies the law of the District

of Columbia by default. *Id.*; *see also America's Choice*, 700 F. Supp. 2d at 7 (applying District

of Columbia law where no conflict with competing jurisdiction). Only where a true conflict

exists should a court apply the District of Columbia's "constructive blending" of the

"governmental interests" and the "most significant relationship" test. *Hercules & Co., Ltd. v.*

*Shama Rest. Corp.*, 566 A.2d 31, 41 n.18 (D.C. 1989); *see also Drs. Groover, Christie & Merritt,*

*P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007).[15]

Plaintiff asserts that Pennsylvania governs its fraud count, arguing in essence that, because it is a Pennsylvania corporation and because Pennsylvania has an interest in protecting its citizens from fraud, application of the District of Columbia's "governmental interests" test calls for the application of Pennsylvania law. Plaintiff, however, neglects to address the antecedent question: *i.e.* whether there is any true conflict at all between the laws of Pennsylvania and the District of Columbia with respect to Plaintiff's cause of action for fraud. The Court, having found no such conflict based upon its independent review of the laws of the respective jurisdictions, will therefore apply the law of the District of Columbia by default. *GEICO*, 958 F.2d at 1141.

2.     Merits of Plaintiff's Fraud Claim

Plaintiff contends that Defendant fraudulently represented to Plaintiff that it would convert a $240,000 CD to partially pay its outstanding debt, thereby inducing Plaintiff to supply additional cement to Defendant.[16] *See* Pl.'s Mem. P.&A. at 10. To prevail on its claim for fraud,

---

[15] Under that test, courts must "'evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review.'" *Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007) (quoting *Dist. of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995)). In so doing, courts also consider certain relevant factors enumerated in the Restatement (2d) of Conflict of Laws, which factors "help to identify the jurisdiction with the most significant relationship to the dispute, that presumptively being the jurisdiction whose policy would be more advanced by application of its law." *Drs. Groover*, 917 A.2d at 1117 (internal quotation marks omitted) (quoting *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 n.18 (D.C. 1989)).

[16] While not entirely clear, Plaintiff also appears to suggest in its moving papers that Defendant acted fraudulently in issuing to Plaintiff four checks returned for insufficient funds. *See* Pl.'s Mem. P.&A. at 10. No such allegations appear under the fraud count set forth in the Complaint, *see* Compl. ¶¶ 41-46, and parties are obligated to plead with particularity

a plaintiff must establish each of the following essential elements: (1) the defendant made a false representation; (2) in reference to material fact; (3) with knowledge of its falsity; (4) with the intent to deceive the plaintiff; (5) the plaintiff acted in reasonable reliance on that representation; (6) which consequently resulted in provable damages. *C & E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 255 (D.D.C. 2007) (citing, *inter alia*, *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)).[17]  Although Plaintiff has arguably met its burden with respect to five of these elements – a question the Court does not reach – it has nevertheless failed to establish that, in providing additional cement, there is no genuine issue as to whether Plaintiff reasonably relied upon Defendant's assurances.

Mindful that Plaintiff's motion is uncontested, the Court nevertheless concludes that myriad undisputed facts on the record, elided by Plaintiff in its moving papers, militate against a finding in Plaintiff's favor on this point.  First, by early September 2008, approximately three weeks before the assurances at issue, Defendant had already incurred approximately half a million dollars in debt, failing to remit payment on any one of the sixteen invoices issued by

---

circumstances allegedly constituting fraud.  Fed. R. Civ. P. 9(b).  Regardless, nothing in Plaintiff's submissions establishes that Plaintiff relied, let alone reasonably relied, upon Defendant's issuance of these checks in providing additional cement.  *See* Pl.'s Stmt. ¶¶ 29-34, 46-53.  The mere suggestion that one followed the other cannot suffice to meet Plaintiff's burden.

[17] Pennsylvania recognizes nearly identical elements to a claim sounding in fraud.  *See Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) ("The specific elements of fraud are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.") (internal quotation marks omitted); *Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (same).  Thus, the Court would reach the same result even if Pennsylvania law were to apply to Plaintiff's fraud claim.

Plaintiff as of that point in time. Pl.'s Stmt. ¶¶ 13-28, 43. Second, it is undisputed that, by September 8, 2008, Plaintiff had become sufficiently concerned as to Defendant's ability to meet its financial obligations that it began requiring Defendant to purchase cement on the basis of cash-on-delivery. *Id.* ¶ 45. Third, in the period between September 11, 2008 and September 18, 2008 (approximately eleven days prior to the assurances at issue), Defendant proceeded to write a series of bad checks to Plaintiff, each of which was returned for insufficient funds.[18] *Id.* ¶¶ 47-53. Fourth, Plaintiff's submissions leave unexplained why Plaintiff continued to supply Defendant with cement products between September 19, 2008 and September 22, 2008, the time intervening between Defendant's issuance of checks returned for insufficient funds and the time of Defendant's alleged representations regarding the conversion of the CD, without any apparent further inducement. *Id.* ¶¶ 35-37. Fifth, the record supports the inference that Plaintiff, a corporation in the business of providing cement to clients nationally and internationally, *id.* ¶ 3, is a sophisticated commercial actor, and Plaintiff does not suggest that it and Defendant ever interacted at anything other than arm's length. Finally, although Plaintiff had means at its disposal to verify Defendant's financial condition, *see* Pl.'s Stmt. Ex. A (Credit Agreement) at 1 ("Customer further agrees to supply such information as may be required by Essroc to . . . warrant the future extension of credit"), the record is devoid of any evidence that Plaintiff ever exercised that right.

Considered together, these facts – which are undisputed based on Plaintiff's own

---

[18] Although Plaintiff's submissions do not specify when it received notice that Defendant's checks had been returned for insufficient funds, the Court shall presume that it was close in time to their issuance. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (all underlying facts and inferences are analyzed in the light most favorable to the non-moving party).

submissions to the Court – compel the Court to conclude that there remains a genuine issue as to whether Plaintiff acted reasonably in relying upon Defendant's alleged assurances. *See* C & E *Servs.*, 498 F. Supp. 2d at 261 ("[t]he reasonableness of a plaintiff's reliance is a 'question of fact, for which disposition by summary judgment is generally inappropriate.'") (quoting *Cassidy v. Owen*, 533 A.2d 253, 256 (D.C. 1987)); *accord Isaac v. Mnemonic Sys., Inc.*, Civ. A. No. 97-0988 (JHG), 1998 WL 151286, at *8 (D.D.C. Mar. 25, 1998).[19] Accordingly, Plaintiff has not established its entitlement to judgment as a matter of law on its fraud claim.

3.    Punitive Damages

While Plaintiff's failure to make out an underlying claim for fraud precludes an award of damages sought in connection with that claim, the Court pauses to note that, even if Plaintiff had hypothetically prevailed on its fraud claim, Plaintiff has independently failed to meet the heightened standard required to justify an award of punitive damages at this stage of the proceedings.

Under District of Columbia law, "[p]unitive damages may be awarded 'only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages.'" *Chatman v. Lawlor*, 831 A.2d 395, 400 (D.C. 2003) (quoting *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995), *cert. denied*, 519 U.S. 1148 (1997)). Where the underlying tort sounds in fraud, this "stringent" standard, *Caston v. Butler*, Civ. A. No. 08-1656 (JDB), 2010 WL 2505591, at *1

---

[19] Here as well, Pennsylvania law is in agreement. *See Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007) (holding that "justifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction."); *accord Eigen*, 874 A.2d at 1189.

(D.D.C. June 22, 2010), assumes a more particularized form. In such cases, a plaintiff is "required to demonstrate aggravating circumstances beyond mere fraud in order to support [a] plea for punitive damages." *BWX Electronics, Inc. v. Control Data Corp.*, 929 F.2d 707, 713 (D.C. Cir. 1991). Specifically, the defendant's fraudulent conduct must be "accompanied by 'outrageous conduct such as maliciousness, wantonness, gross fraud, recklessness and willful disregard of another's rights." *Chatman*, 831 A.2d at 400 (quoting *Riggs Nat'l Bank v. Price*, 359 A.2d 25, 28 (D.C. 1976)); *accord BWX Electronics*, 929 F.2d at 712-13.[20] Stated differently, fraud alone is insufficient to render an award for punitive damages justifiable; there must be something more.

Plaintiff contends that punitive damages are mandated because Defendant "had actual knowledge of the fact that it was issuing bad checks, had actual knowledge that it would not be converting the $240,000 CD to pay off a portion of its past due balance and made willful misrepresentations to secure the Cement." Pl.'s Mem. P.&.A. at 14. In this regard, Plaintiff offers nothing more than a restatement of the facts supporting its underlying claim for fraud. *See, e.g.*, *C & E Servs.*, 498 F. Supp. 2d at 255 (identifying the defendant's knowledge of the falsity of its representation, and its intent to deceive the plaintiff, as essential elements of a claim for

---

[20] Again, the Court observes that the same result would be dictated were Pennsylvania law to apply to Plaintiff's fraud claim, as the courts of that state have also held that, "when fraud is the basis of compensatory damages, the same fraudulent conduct is not sufficient to base an award of punitive damages without more." *Pittsburgh Live, Inc. v. Servov*, 615 A.2d 438, 442 (Pa. Super. Ct. 1992). As is the case in the District of Columbia, Pennsylvania law requires "acts of malice, vindictiveness and a wholly wanton disregard of the rights of others" to justify an award of punitive damages in the case of fraud. *Id.*; *see also Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 741 (3d Cir. 1991) (concluding that Pennsylvania law "requires a quantum of outrageous conduct in addition to that undergirding . . . fraud liability and compensatory damages."), *cert. denied*, 505 U.S. 1221 (1992).

fraud).  Indeed, Plaintiff's argument reduces to a contention that this Court should award punitive damages solely on a finding that Defendant made an intentional misrepresentation to Plaintiff. However, District of Columbia law is clear: a plaintiff seeking punitive damages in fraud must show more.  *See Dist. Cablevision L.P. v. Bassin*, 828 A.2d 714, 725-26 (D.C. 2003) ("in the absence of 'gross fraud' or comparable wrongdoing, proof of even intentional misrepresentation may not suffice to justify punitive damages."); *Boynton v. Lopez*, 473 A.2d 375, 377-78 (D.C. 1984) (award of punitive damages not supported by the evidence where record merely supported finding of "intentional misrepresentation," not willful and outrageous conduct or gross fraud).  In short, because the undisputed facts identified in Plaintiff's submissions fall woefully short of demonstrating the sort of outrageous and malicious conduct required to support an award of punitive damages, Plaintiff cannot recover such damages here.

## IV.  CONCLUSION

For the foregoing reasons, the Court shall GRANT-IN-PART Plaintiff's [26] Motion for Summary Judgment with respect to Plaintiff's claim for breach of contract and award Plaintiff damages in the amount of $586,503.49, along with reasonable attorney's fees, costs, and post-judgment interest calculated at the statutory rate, and DENY-IN-PART Plaintiff's motion with respect to its claims for unjust enrichment and fraud.  An appropriate Order accompanies this Memorandum Opinion.


Date:   September 27, 2010


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge